

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00025-CR

Guillermo **CAPETILLO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2017-CRB-000381-D1
Honorable Joe Lopez, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Patricia O. Alvarez, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: September 30, 2020

AFFIRMED

Guillermo Capetillo was convicted by a jury of one count of murder and one count of aggravated assault with a deadly weapon arising out of the same incident. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 22.02(a)(2). On appeal, Capetillo asserts the evidence is insufficient to support his convictions and the jury's implicit rejection of his claim of self defense. We affirm the trial court's judgment.

**BACKGROUND**

In the early morning hours of January 15, 2017, a group of friends including Daniel Murillo, Ernesto Rodriguez, and Jonathan Morales were drinking and doing cocaine at Murillo's house when Capetillo arrived and invited them to an after-party at Kush Smoke Emporium. Murillo and Morales testified to their understanding that Capetillo wanted them to go to Kush in order to "back him up" because there was going to be a fight; "something was going to go down." Capetillo and the other three men left the house in Murillo's white Chrysler 300 sedan. Rodriguez's handgun was beside him on the backseat.

When they arrived at Kush, everyone exited the car and approached the entrance. There were a lot of people standing outside the entrance. With Rodriguez's gun in hand, Capetillo walked straight up to his girlfriend Carina Ochoa and began yelling at her. Murillo and Rodriguez testified they saw Capetillo, who was already angry before they got to Kush, point the gun at Carina and yell, "What are you doing here? Go home." Capetillo and his three friends then returned to Murillo's vehicle and got back inside. According to Rodriguez, Capetillo still had possession of the gun when he got back into the car.

Daniel Murillo testified that he was in the driver's seat, Capetillo was in the front passenger seat, Morales was in the backseat behind him (Murillo) and Rodriguez was in the backseat behind Capetillo. Murillo stated that he had put the car into reverse when a group of five or six men surrounded the car and began hitting the windows. One of them started punching Murillo's driver's side window and making a gesture "like he was going to pull a gun." Although Murillo did not see a gun, the man outside his driver's window was "lifting his shirt up as if he had a gun" and Murillo testified the men were "known to have guns" and to be "troublemakers." Murillo thought the men were going to shoot them and he yelled out, "they have guns." Murillo testified he was afraid for his life. Capetillo then got out of the vehicle and Murillo saw a "sparkle" and

heard Capetillo fire three to five gunshots. Before Capetillo got out, one of the men was punching Capetillo's passenger side window and trying to open the door handle. Murillo testified that the doors were locked. Murillo also testified he did not see the man at the front passenger window next to Capetillo make a gesture like he had a gun. After the shots were fired, Murillo drove away with Morales and Rodriguez and left Capetillo behind at Kush. Murillo testified that the gun used in the shooting was owned by Rodriguez.

Jonathan Morales testified that after Capetillo spoke with his girlfriend at Kush, their group calmly returned to the Chrysler. He stated no one was aggressive toward them while they were outside the car. Once inside the vehicle, they began to reverse to leave. Morales was sitting in the backseat with Rodriguez beside him. Murillo was driving and Capetillo was in the front passenger seat. As the car was in reverse, six men approached the car and began banging on the doors and windows. All the windows were rolled up; none were broken during the incident. Morales stated he was holding on to his door while the handle was being yanked on from outside. When asked if he thought the door was going to be opened, Morales replied that he did not know and explained it was "an instant." He heard Murillo say the men had guns and he saw them picking up their shirts and grabbing at their waist like they had handguns. But Morales never saw them with actual weapons. Morales testified he was in fear for his life. He saw Capetillo reach toward the backseat and then get out of the car, after which he heard gunshots. Morales saw Capetillo pointing a gun and heard the gunshots. Morales was yelling at Murillo "let's go" and they sped away.

Ernesto Rodriguez testified the gun used in the shooting belonged to him. Rodriguez stated that when they arrived at Kush, Capetillo "just snapped," grabbed Rodriguez's gun from the backseat, and walked up to his girlfriend pointing the gun and yelling, "What are you doing here? Go home." Capetillo kept possession of the gun when they returned to the car. Rodriguez explained the same seating arrangement inside the vehicle as Murillo and Morales. Rodriguez

testified that as they were leaving the Kush parking lot, about five guys ran up to the vehicle and started banging on the windows. The windows had a dark tint and were all rolled up. From his position in the backseat, Rodriguez saw one man standing outside the driver's side window "grabbing like he had a gun." Although Rodriguez did not actually see the man with a gun, he testified he was in fear for his life and thought he was going to be shot. Rodriguez saw Capetillo get out of the car and then heard gunshots. Rodriguez testified Capetillo was the only one who got out of the car and he was the only shooter. Rodriguez also explained that the men surrounded the car "within seconds" of them re-entering the car. After the shooting, the three of them drove away in Murillo's car.

Jose Ortiz was with his friends Leonel Maldonado, Jr., Angel Borjas, and Sergio Ramirez, Jr. at the party at Kush. Ortiz testified a guy he did not know came up to him asking about his girlfriend and "got a bit aggressive." Then Ortiz saw Capetillo arguing with his girlfriend outside and saw him cock a gun. Because he did not want any problems at the party, Ortiz caught Capetillo's attention and told him, "Hey, don't do that here." After Capetillo and his friends walked away, Ortiz and his group of four or five friends went outside to "see what was happening." Ortiz and his friends surrounded the white Chrysler and began banging on the windows "to tell him, like, what was he doing?" Then, someone got out of the car from the rear seat and started shooting at them. Ortiz could not identify the shooter. Ortiz and his friends tried to run away. Ortiz helped his friends Maldonado and Ramirez after they were shot. Ramirez was unresponsive at the scene.

Angel Borjas testified he was at the party at Kush. He and his friends left the party and approached a white car outside in the parking lot. There were a lot of guys around the car. Borjas was near the driver's side of the car. He saw a guy get out of the front passenger seat and start shooting at them. Borjas saw him shoot Maldonado first and then shoot at him (Borjas). Borjas

stated that two men got out of the car, but there was only one shooter and he fired about ten to twelve shots. It all happened "really fast" after they approached the car and "the guy got out right away" and "shot right away;" "he didn't think about it."

Leonel Maldonado, Jr. testified he did not remember much about the night of the shooting because he was drunk and had used cocaine. Maldonado stated he was outside Kush smoking a cigarette when his friend Borjas came out and told him "somebody got close" and another guy said there was "a car outside that was causing problems." Maldonado stated he led the way to the car to see what was happening and he was willing to get in a fight. Maldonado approached the front passenger side of the vehicle. He testified that he intended to open the car door. However, Maldonado stated he did not even get a chance to open the door because he saw the guy in the passenger seat turning and reaching for something inside and then he felt that he was shot. Maldonado was shot in the chest. After he was shot, he ran back inside Kush. He was later transported to the hospital.

Capetillo was charged with the murder of Ramirez and the aggravated assault of Maldonado with a deadly weapon. He pled not guilty and proceeded to a jury trial. The jury convicted Capetillo of both counts and the trial court sentenced him to concurrent sentences of 32 years' imprisonment on the murder count and ten years' imprisonment on the aggravated assault count. Capetillo appeals.

**ANALYSIS**

Capetillo argues the evidence was insufficient to support the jury's findings of guilt and its implicit rejection of his claim that he acted in self defense when he shot Ramirez and Maldonado. Specifically, Capetillo asserts he was denied the benefit of a statutory presumption that his belief that deadly force was immediately necessary was reasonable.

To prevail on a claim of self-defense with the use of deadly force, a defendant must prove: (1) he would have been justified in using force against the other person; and (2) it was reasonable to believe that "the deadly force [was] immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. at § 9.31(a). A person has the right to defend himself against apparent danger to the same extent as he would if the danger was real. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). A "reasonable belief" is defined as "a belief that would be held by an ordinary and prudent person in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42). "Deadly force" is defined as "force that is intended or known by the person using it to cause, or in the manner of its intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE ANN. § 9.01(3).

The actor's belief that the use of deadly force was immediately necessary is presumed to be reasonable if the actor:

(1) knew or had reason to believe the person against whom the deadly force was used:

    (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied . . . vehicle;

    (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's . . . vehicle; or

    (C) was committing or attempting to commit an offense described by Subsection (a)(2)(B) [aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery];

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor . . . at the time the force was used.

TEX. PENAL CODE ANN. § 9.32(b).

Once a defendant produces some evidence raising the issue of self-defense, the State then bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). To meet its burden of persuasion, the State is not required to produce additional evidence. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). If the jury finds the defendant guilty, it has made an implicit finding against any defensive theory raised by the defendant. *Id*. at 914; *Zuliani*, 97 S.W.3d at 594; *Valverde v. State*, 490 S.W.3d 526, 528 (Tex. App.—San Antonio 2016, pet. ref'd).

When a defendant challenges the sufficiency of the evidence to support the jury's implicit rejection of his self-defense claim, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914; *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Valverde*, 490 S.W.3d at 528.

Capetillo argues he was deprived of the statutory presumption that he held a reasonable belief that deadly force was immediately necessary to protect himself against the others' use or attempted use of deadly force. The record, however, shows the jury charge contained an

instruction on the statutory presumption that tracked the language of section 9.32(b) as quoted above. The charge further instructed the jury in relevant part that, "the presumption applies unless the state proves beyond a reasonable doubt that the facts giving rise to the presumption do not exist." *See Villarreal v. State*, 453 S.W.3d 429, 435 (Tex. Crim. App. 2015) (explaining that a complete instruction on the presumption of reasonableness must inform the jury that the presumption does not apply if they find the State's evidence negated one of the statutory prerequisites for the presumption). If the jury found the presumption did not apply, the charge instructed the jury that it must still hold the State to its burden to prove each of the elements of the charged offenses beyond a reasonable doubt.

Capetillo essentially argues the jury misapplied the presumption instruction to the trial evidence. Capetillo did not testify but points to the testimony of the other three occupants of the vehicle that they feared for their lives because the men around the car were banging on the windows, pulling on the door handles, and lifting up their shirts as if they had guns. Capetillo also argues there was no evidence that he provoked the shooting victims or that he was engaged in any criminal activity.

As noted, in assessing the legal sufficiency of the evidence to support the jury's implicit findings underlying its verdict, we view all the evidence in the light most favorable to the verdict. *Jackson*, 443 U.S. at 318-19; *Saxton*, 804 S.W.2d at 914. As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the jury could have found that the evidence failed to establish the prerequisites for applying the presumption of reasonableness. *See Brooks*, 323 S.W.3d at 899. Capetillo's friends Murillo and Morales testified that Capetillo invited them to Kush in order to "back him up" in a fight and that Capetillo was already angry, which supports an inference that Capetillo intended to provoke or engage in a fight before he arrived at Kush. Once he arrived at Kush, Murillo and Rodriguez testified Capetillo walked directly up to

his girlfriend, yelling and pointing the gun at her. Ortiz also observed Capetillo threaten his girlfriend and stated that Capetillo cocked the gun when he pointed it at her. Thus, the evidence establishes that Capetillo exhibited a deadly weapon while intentionally threatening another with imminent bodily injury, which conduct constitutes the felony offense of aggravated assault. *See* TEX. PENAL CODE ANN. § 22.02(a)(2), (b). Ortiz testified he admonished Capetillo, "don't do that here." Capetillo and his friends then immediately returned to their vehicle and Ortiz and his friends followed them and surrounded the vehicle. Based on the testimony, the jury could have found beyond a reasonable doubt that Capetillo was engaged in criminal activity which led to the confrontation at the car.

With respect to the jury's rejection of the self defense claim, the evidence was undisputed that Capetillo was the only person involved in the confrontation that had a deadly weapon. Even though Capetillo's three friends testified that Ortiz and his group made gestures as if they had guns, none of the vehicle's occupants actually saw a gun and no other gun was found at the scene. Capetillo took Rodriguez's handgun from the backseat of the vehicle before he entered Kush and Murillo testified Capetillo was still angry and still had possession of the gun when he re-entered the vehicle. Capetillo was the only person to get out of the car and all three of his friends identified him as the sole shooter. Capetillo fired the gun multiple times at more than one of the other men. Maldonado was standing outside the front passenger side where Capetillo was seated; Capetillo exited the car and shot Maldonado in the chest. Capetillo then shot Ramirez in the back of his head as Ramirez was running away. After the shooting, Capetillo fled separately while his other three friends left in Murillo's vehicle. The jury could have found that Capetillo's use of deadly force was not justified because it was not reasonable for him to believe the deadly force was immediately necessary to protect himself against the other men's use or attempted use of deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a).

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude the jury could have found beyond a reasonable doubt that Capetillo was not entitled to the statutory presumption that his use of deadly force was reasonable and that he did not act in self defense when he intentionally and knowingly shot and killed Ramirez and wounded Maldonado.

**CONCLUSION**

Based on the foregoing reasons, we affirm the trial court's judgment.

Liza A. Rodriguez, Justice

DO NOT PUBLISH